Good morning. We're here this morning to hear argument in two cases. The first case is Keefer v. President of the United States. We'll hear for counsel from appellants first, and please indicate how much time, if any, you request for rebuttal. We request reserve for rebuttal. Thank you, Your Honor. May it please the Court, I'd like, my name is Eric Cardall, representing the appellants. I'd like to reserve five minutes for rebuttal. Okay, thank you. My clients, 27 Pennsylvania state legislators, are winners because they have fulfilled or wanted to fulfill their constitutional duty for state legislatures to prescribe federal election laws in Pennsylvania, 25 Pennsylvania statutes section 1321, 1328, and 2607. Defendant executives have flouted Pennsylvania's prescribed law and changed law by executive fiat. The governor's automatic registration edict mandated voter registration instead of applying for registration. The Department of State directive directs the county boards of election to accept, not reject, invalid voter registration applications. Executive order 1409 requires private parties to be involved in voter registration. Can I ask you about that? EO 14019, I hope I got the sequence of numbers right, predates SB 982. And since SB 982 was, according to your brief, drafted to address that, how is any power of the legislature nullified? Well, the EO 1409 violates the 2021 statute that prohibits the private party funding. But your argument is about SB 982, which was passed on July 11, 2022, about a year and a half after 14019. So how does EO 14019 nullify that in any way? Well, it would conflict with the state legislative action. And so that would be what we're describing as the state laws under the election clause are the prescription of the federal election law subject to congressional enactments, not executive orders issued by the president. It strikes me from your intro that you're focusing on kind of like the merits. Is there a substantive conflict between state law and federal law or the state legislature's actions and the governor's actions? But a lot of this case just comes down to Article III standing and whether there's an injury in fact. And we've got a good amount of Supreme Court law that says, you know, look, individual legislatures can't, TORs, can't sue on behalf of the institution of the legislature. And so, you know, they say you don't have standing to sue on behalf of the institution. So maybe they can sue on behalf of themselves, but they would need a personal stake in the outcome. They would need a concrete, particularized, actual or imminent injury. And so where are you on standing? You think that they have institutional standing that these legislators can sue on behalf of the entire legislature? Or do you think that it's they've been hurt individually such that even if they were to resign office, they would sustain the exact same injury? You know, that'd be ongoing. But Coleman, of course, we're familiar with the sentence. We think these senators have a plain, direct, adequate interest in maintaining the effectiveness of their votes. But there's another sentence. They have set up and claimed a right and privilege under the Constitution of the United States to have their votes given effect. And the that is the state legislative powers under Article 5. Here you have the state legislative prerogatives under the Election Clause. There are constitutional limitations on the executive branch in Coleman under Article 5. Here there's limitations on the executive branch because of Article. So is that what makes the difference? Is it the fact that you can tie it back to a specific, as opposed to like a 14th Amendment, like just a, we don't like gerrymandering, it's an equal protection claim. You're saying that, no, this actually begins to tie to something closer in the Constitution where it actually references legislative, state legislative power? Well, well, that's, that, that was Coleman, right? So it was, that was legislature under Article 5. The court was recognizing individual state legislators standing. U.S. Supreme Court recently in the Arizona redistricting case, relying on Coleman, recognized the state legislature would have standing too. So the individual state legislators are, you know, constitute the body that constitutes the state legislature. So, so, so this, this may well be a case that if, if, if the plaintiff was not individual legislators, but the legislature itself, that, that the Arizona case would, would, would give us a lot of light. But there is that extra kind of ground to cover between the legislature and the individual state legislators. Is there, is there some basis for kind of covering that? Is it, is it the Pennsylvania Supreme Court's case in FUMO that basically says we, we let them sue for purposes of state law? Or are you going to turn to an individual capacity basis for saying, no, it's not really an institutional thing, but an individual thing? I think that with respect to the court's inquiry into this very narrow subject area, the U.S. Supreme Court case in Susan B. Anthony helps. The doctrine of standing gives meaning to be those constitutional limitations by identifying disputes which are appropriately resolved in the judicial process. So in the first part of your question, yes, the state legislature could bring this claim. Now, why that's too high a jurisdictional bar is because sometimes the executive is in a with the political party that controls one of the two houses of the state legislature. And so this is very practical. So President Biden, Governor Shapiro, or the Democratic Party, the Democratic Party controlled one of the two houses in the Pennsylvania state legislature. So in light of this fact, would the court recognize the need for recognizing standing so that this case can be heard to address the constitutional limitations in the election clause on the executive? So basically what you're saying is we need to come to the courts because the normal political process, at least at present, wouldn't vindicate these interests? Well... Or the law is written? Well, Article III, I think the way that we understand it is different than the federal executives. We believe that the elections clause in Article III, that the election clause limitation also on executive power. So it limits executive power. And so the court would want to facilitate standing so it appropriately adjudicates the cases where the executives have exceeded their power under the election clause. So in other words, when the election officials at the state are using executive fiat to change election law without going through the legislative process, it would seem like the federal court would want to have that case before it. The ordinary course under Arizona redistricting case is the state legislature pass a joint resolution and authorize the lawsuit. But where that doesn't happen, you still have an executive action changing election law without going through the legislative process. And so there would be standing here in that situation. So Coleman leads to the Arizona redistricting case, which relies on Coleman, which leads to this case. So I'd like to stop you in that train and go back to Raines. So the scenario that you're describing to me sounds pretty similar to what was alleged in Raines with the executive essentially somehow diminishing the legislature's power. And the court was quite clear there in narrowing Coleman to say that at most legislators whose votes would have been sufficient to defeat or enact a specific legislative act have standing to sue if that legislative action goes into effect or doesn't on the ground that their votes have been completely nullified. So how do you mesh your theory with Raines? After Raines, the U.S. Supreme Court granted cert on standing in the Arizona redistricting case and addressed specifically the standing of state legislatures to bring claims under the election clause against executives who are alleged to have violated the limitations in the elections clause. And so in that case, they relied on Coleman to find that the state legislature had standing to bring the case. The Raines case involved congressional members. And it did have DICTA interpreting Coleman. But you're not suing on behalf, your plaintiffs are not the legislator. They are legislators. Right. So the idea is that by the U.S. Supreme Court relying on Coleman, individual state legislators standing to find standing for the state legislature, that of course the individual state legislator standing still exists. Coleman is good precedent. The Raines case isn't directly applicable because it involved congressional member standing. Here we're alleging that individual state legislators have a prerogative to prescribe federal election laws in the states. So Raines would be distinguishable. Many of the cases relied on by the federal executives are distinguishable, but I'll have to save that for rebuttal. All right. Thank you. We'll hear you on rebuttal. May it please the court. McKay Newmeister on behalf of the federal defendants. The Supreme Court has foreclosed suits by individual legislators in their capacity as legislators and all but the narrowest of circumstances. In Raines v. Byrd, the court made clear that individual legislators do not have standing to assert institutional injuries to the legislature as a whole. And this court has recently reiterated that principle in Yaw v. Delaware River Basin Commission. This case falls squarely within those precedents. Now, the discussion this morning has focused on the Supreme Court's decision in Coleman. But as the Supreme Court explained in Raines, and as Judge Freeman reiterated, the court limited the holding in Coleman to stand at most for this narrow proposition of when legislators have votes that are sufficient to defeat or enact a specific legislative act. They have standing where that action, that specific action, goes into effect or does not go into effect on the ground that their votes are completely nullified. So if I may interrupt, you know, just to take a step back. As I see standing, Article 3 standing, it's one of the justiciability doctrines. And it really focuses, it's not an absolute justiciability bar. It's really a bar on who can sue. The question is who has standing? What are the attributes of an individual who has a personal stake in an outcome? But it's not meant to bar the issue from ever getting in federal courts. It's more a tightening. We want to make sure that the issue comes with people who are really, really, really here, since they have a stake in it. So it seems that to prevent standing from becoming a bigger justiciability doctrine, it usually helps if you can point to someone and you can say, ah, this person doesn't have standing, but this entire set of people would. Are you able to help your case by pointing to an entire set of people who would have standing in this case so that we know that we aren't taking the who part of the justiciability doctrine and making it an absolute justiciability doctrine such that we populate the null set of who? Yes, Your Honor. So essentially, there are sort of the two questions, which is, is the right party suing here the party that is injured? And then there's the other questions that arise in normal standing cases. Is there a concrete actual injury? In fact, is there addressability? Is there traceability? And so with respect to that first question, we know under the Supreme Court decision in Reins and decisions of this court that individuals are not the proper party to assert injuries to the institution. The Supreme Court in the Arizona State Legislature case said that under the Elections Clause, that is an institutional claim that is properly raised by a state legislature as a whole, both houses, as an institution. So to complete the thought, if the Pennsylvania Legislature as a whole, both houses initiated this suit, that's fine. They would at least overcome this barrier. I'm not asking for a clean bill of health on everything in the case, but at least the obstacle that we're talking about now, I'm not pushing you for a concession, but it seems like they would clear that. So they would not run into this problem of an improper party, an individual raising an institutional injury. There has to be a proper alignment between who the injury runs to and who is raising that injury. It's an institutional injury, and so these individuals simply cannot raise that. So what do we make of the fact, though, that Reins was really kind of all on the same plane? It was federal legislator, federal law, federal executive, federal everything. And so your resort to the political process feels like it's all at the federal level. We've got the Supremacy Clause, which tips the balance of federal over state. And so if Pennsylvania kind of doesn't, you know, if an individual, it feels that we're closer to a federal law, at least with the case against your clients, being thrown into an individual state legislator, and it strikes me, does that takes a little bit closer to a Coleman scenario where an individual says, hey, look, it's not the exercise of state power that's usurping my legislative function. It's the exercise of a federal power. And maybe if it's a state power, that's fine. But when it's a federal power, man, that just feels like you're injuring me in a kind of a very strong way, because I can't remedy that for the state political process. So two responses to that, actually means and requires. And the second is what this court has already done with respect to these issues in the Yaw case. So when Raines was discussing Coleman and describing at most what Coleman continues to stand for, it was talking about a distortion of the legislative process, whereby votes within that process are not properly counted. And so that is what was happening essentially in the Coleman case. And so in order to establish standing under Coleman, as it has been understood by Raines, and by this court, for instance, and Russell v. Dijon, the legislators would have to point to a specific legislative act that should have passed, but was not passed because their votes were not properly counted within the legislative process. That's simply not what they're alleging in this case. And so with respect to Coleman, there's just, there is not vote nullification, as Raines explained, vote nullification meant with respect to this narrow circumstance in which there might still be standing. Now, when you bring in the question of federal actors into this process, the Yaw case is a helpful example. So in that case, there were individual Pennsylvania state senators that were suing an interstate compact commission that was made up of governors of four states and a federal representative. That commission had regulated over hydraulic fracking within the Delaware River Basin. That was not just state officials against state officials, there was federal representation on that body. And this court in Yaw said that the Raines principles apply the same in that case, even though it was slightly different than other factual circumstances. Thank you. Can I just pick up on a question I asked your colleague on the other side about FUMA? What if a state says, you know what, we're going to, for our purposes, under state law, we're going to authorize any individual legislator to sue. They can be a representative of the legislature because we recognize that in majoritarian politics, sometimes we want the law to be followed, even if it's convenient for some majority for it maybe not to And so what if a state said, yeah, it's fine with us if an individual legislator has standing? The Supreme Court of Pennsylvania seemed to at least come really close to that in FUMO. And so if the state says, yeah, individual legislators can sue, why does Article III standing somehow eliminate the case or controversy that would otherwise exist under state law? So I see my time is up at five minutes. Thank you, Your Honor. So with respect to the FUMO case specifically, similar arguments were raised in the Yaw case. And this court in that decision rejected the reliance on FUMO as a basis for trying to expand the ability of individuals to assert institutional injuries. It is possible that an institution as a body can authorize individuals who are members of that body to assert the injuries to the institution. But they have to do that. It's not enough just to rely on state Supreme Court precedent that recognizes cognizable injuries that are different than the injuries sufficient under Article III. State law can't lessen the requirements of Article III. A legislative body as a whole can authorize subsets of that body to represent the interests of the whole body to assert the institutional injuries that have been granted that authority in this case. So I have one more question, but my colleague is going to question. So I guess my last question is, you know, I think it's in Reins where Justice Ginsburg talks about, well, in order for there to be a personal stake in the outcome, you kind of have to have the same injury, you know, if you're in the office or if you're out of the office. So if you resigned, you know, and all of your injury went away, maybe that's not a particularized injury. And so I guess my question is, if they resigned, wouldn't they still have, if we use that as kind of the rubric, if they resigned and their injury is they want to maintain the efficacy of their votes, that's in play even post-resignation. So doesn't that show a little bit that kind of the architecture of Reins that led it to limit and distinguish Coleman and a couple of other cases isn't necessarily present anymore? So, Your Honor, I think it's helpful again to focus on what vote nullification actually means under Reins. So there were arguments about efficacy of votes that were raised in Reins and the court rejected those and said, it's not enough to say your vote is less effective than it was before. You need to show complete nullification of your vote within the legislative process. And if you look at the kind of injuries that are being alleged here, it's not about the fact that their votes weren't counted. In fact, going to Judge Chung's questions, the legislators passed SB 982 after the executive order was in effect. They voted on that bill. It was signed into law. That is a valid law of the Commonwealth of Pennsylvania. And really what they're seeking is to assert concerns about the effectiveness of that duly enacted law going forward and whether it's going to be given full vitality and full enforcement. The court in Yaw had a very similar argument for it, and it said continued vitality of a law that's on the books is not a cognizable injury under Article III for individual legislators. Rather, that's a generalized grievance that runs to all citizens of a state in the proper administration of their government. And so that is not the kind of thing that an individual legislator can assert standing based on the fact that they voted for something and it became law and then there were issues with its potential enforcement or application going forward. That does not grant standing to these individual legislators suing as legislators here. Thank you. Good morning, your honors, and may it please the court. Jacob Boyer on behalf of the state appellees. I'd like to begin by giving a bit of a further answer to the last two questions you asked Judge Phipps. One about what do we make of FUMO in the state court doctrines and then second about what vote nullification means and where the lines are. The question you asked about, well, might there be situations in which an individual legislator could be authorized to represent the legislature? The Virginia case from 2019 in the U.S. Supreme Court recognized that these are distinct questions and it grapples with both of them. Is there Article III standing and had the House in that case been authorized to represent the legislature? And you need to answer them both. Whether a state has authorized an individual legislator to represent the legislature is entirely distinct from whether an individual legislator suing on their own behalf has Article III standing. So there's really, you couldn't look to the state court doctrines and state court decisions to answer the Article III question. You could only look to the state court body of law to answer might there be a situation in which an individual legislator has been authorized to institutional interests of the legislature. The second question about vote nullification, I completely agree with everything my colleague said about what the line is. And I think there's two very helpful footnotes, one from a Supreme Court decision and one from this court's decision that really nicely present what the line is. And that's footnote seven from Raines in which it refines what exactly Coleman nullification means. And again, I think my colleague identified and defined it precisely right. And footnote four from this court's 2007 decision in Russell, sort of walks through the same cases that the appellants rely on to explain what the distinction is between, for example, Coleman, Dennis, which is a 1980s decision they rely on and to the extent the court is interested in looking at the 2001 silver decision from the New York court system, what distinguishes those from a situation like this, which as you heard from appellants, discussion is entirely just about a generalized allegation that some executive action doesn't comply with the law. But I guess, you know, to return to a theme that they asked beforehand, it begins to feel like the individual legislator's belief that laws that they passed weren't followed and that there's no objection to those. It's kind of just a, you know, just that they're being followed by the Pennsylvania governor and others in Pennsylvania and that members of the legislature are kind of fine with that. I think that's, I'm trying to make a strong form of their case. And so they say, well, wait, we have no meaningful redress. The political process has failed us. There's no real opportunity here to go and enforce the laws that we made through anything other than a court. We come to a federal court because we believe this is our right under the federal constitution. And the federal court closes its doors and says, no, sorry, that law that you have under the constitution, the elections clause, no, no, we aren't going to police that. And so you could understand their sentiment that, wait, you know, maybe the elections clause is a hollow promise for us if what's given to us can't be enforced. A couple of responses, Your Honor. I think, one, that is the strongest form of their case. And it is one that the Supreme Court and this court have repeatedly rejected. I don't think there's any ambiguity in the precedent that even the case that you laid out, which I completely agree is the strongest form of the case, is nothing more than a generalized grievance. And courts, this court, the Supreme Court, in explaining why it's important to enforce Article III rules, particularly acutely in situations where you have inter-branch disputes, is that there are alternative ways in which a legislature or even an executive, there are other methods. And, you know, the availability of the political process isn't the rule itself. It sort of explains why Article III standing is enforced rigidly here. And I think in this situation, there isn't any loss of the political process for the legislature. It retains completely all options it might otherwise possess if it feels there has been a violation of the law. And it's important to note, in Raines, for example, the six Congress members who made the argument, well, you know, our laws, our ability to vote has been diminished in a significant way. And, you know, that we believe really is our power conflict with our law. The U.S. Supreme Court said, you know, you may believe that it's insufficient for standing and you have the political process available to you. Nothing about this law amends or changes the political process, which is true here. And it's important to note in Raines, the U.S. Supreme Court was considering the Lying-Eyed and Veto Act, which President Clinton had just signed into law the year before, and said the political process remains. And certainly the legislature said, well, President Clinton will veto that statute. So, but it strikes me that, look, I get the point. Everybody has the same interest in the law being followed. And so you can be a legislature, you can be a person. So it can't just be that. You need something in addition to that. But don't you begin to get something close to in addition to that when the Constitution signals you out or at least the body that you're part of out and says, this is your power. It's not everyone's power. It's your power. And then you say, you know, I'd like to exercise that and I'd like to see my exercise of that be vindicated. It strikes me that in that instance, yes, there's a generalized grievance that everyone has. But the person who's designated by the U.S. Constitution to do that, don't they have anything else? Or you just sit there and say, so sorry. Once you exercise that constitutional function and it became the law, your interest now merges with everyone else's interest and it becomes generalized, even though you were given this specific power under the Constitution. Yes. And the specific power, Your Honor, is not a unique feature in any respect. Anytime a legislature has passed a law, it will be doing so pursuant to its constitutional ability. So let's look at the Virginia case, for example, that the Supreme Court considered in 2019. The House, not just an individual legislator, but the House itself said, look at the Virginia Constitution. It specifically empowers us to redistrict and draw the lines under which our members will be elected. It didn't matter if it was a constitutional grant. Because anytime you're saying we passed a law, that'll have been done pursuant to some constitutional authority. Legislators don't act without power. They need to have a constitutional basis for doing so. So the Elector's Clause or Elections Clause is unique in the sense that it's a U.S. Constitution giving a state court power. But the fact that the legislature can point to some constitutional authority that informs what it has done is going to be true in every single case in which they've passed. But there was standing in the Arizona case under the Elections Clause. And you're saying that doesn't matter because, and so I guess my question of who, you seem to maybe be conceding the same thing. If the entire Pennsylvania legislature wanted to initiate this suit qua legislature, not as individuals, we would at least overcome the hurdle that you're presenting in today's case? Yes, I think the U.S. Supreme Court's decisions on this do draw that line. The General Assembly or a legislature's institutional interests, if it's in a position to say there's been some deprivation of our powers, the institution itself certainly has, would not encounter the same problem that the individual legislators encounter in this. And I would note, I understand your questions are geared at what remedies are available in federal court. State court remains available. In fact, there are lawsuits, I think there's at least two or three, about some of the very same issues raised in this case currently pending in state court. So it's not as if these issues are immune from judicial review just because the individuals that have brought this case quite clearly fail to allege a particularized injury under Article III based on the Supreme Court and this court's decisions. If the, with respect to the AVR, the Automatic Voter Registration, if you had all the no votes on the committee and they brought suit against the Automatic Voter Registration, would they have standing or would there have to be? Not under this effect because as Coleman makes clear, and you see this in Dennis as well, what you need to allege is an actual act that you have voted on or not voted on has taken effect or not contrary to your votes. And the redesign of our voter registration application that implemented a form of Automatic Voter Registration has no bearing on any legislation. So they've identified SB 40, which was a bill introduced in Pennsylvania's last General Assembly that would have done, implemented some form of Automatic Voter Registration. And I will note here, it's important to recognize Automatic Voter Registration is not a single term. I think there's more than 20 states that it would say, and now including Pennsylvania, that they have a form of Automatic Voter Registration. And it means different things. I read what the provision is. So if the executive had, instead of enacting the AVR here, but instead put the bill that was voted down in committee, somehow was able to put that on the floor, then would those? Yes, I think that would be a different situation. So then you're in a situation in which the votes have not dictated the outcome of the legislative process. So if there is an external act that modifies what would otherwise obtain through the legislative process on that specific act, then you're in the world of Coleman or Dennis. In those situations, it was an issue with a specific concurrent resolution that the Lieutenant Governor voted on, a specific individual who had been sort of nominated going around the legislative process after that same nominee had been rejected. In Silver, you have a budget bill, the exact budget bill being vetoed, allegedly unlawfully. So you need a specific legislative act, the outcome of that having been modified because of something external to the legislative process. And the result needs to have been different than that which would have obtained under the legislative process. So the fact that the redesign didn't put SB 40 through committee, didn't bring it to a floor vote, didn't make it law, nothing happened to SB 40 other than the outcome that was consistent with the legislative process. That's why there's no relationship between those two. To complete your kind of thought on that hypothetical of, you know, if the specific legislation that had been voted down in the legislature were subsequently enacted by some other means, in your view, who would the appropriate group of people be who would have standing to challenge that? So Rain says under that situation, that's the world where you're in the situation of at most when you have a specific act, a majority of those, and it's unclear if the line about a majority of legislators is, goes to the injury in fact or another prudential concern, but now we're moving into the world of Coleman in which there could be a situation in which those who voted, whose votes weren't respected because of something that modified. So if it were, for instance, if that hypothetical situation had occurred here, but we had the same group of 27 plaintiffs, what would occur? We would not have the same arguments that those individuals have not suffered. I think then you're in the world of Coleman where something that you have voted down in that hypothetical has somehow moved forward, notwithstanding your votes in the legislative process, right? You need it, but it has to tie to the outcome of a specific legislative act, which as you heard from appellants here is not their argument. It's just that they contend the redesign that implemented automatic voter registration of the directive violate 1321, 1323, and in that situation, we are squarely in this court's precedent and the world reigns in the Virginia Bethune-Hill case. So just one more hypothetical for you, you know, embedded in all of this kind of legislator standing is the notion that we live in a world of majoritarian vote, and so the notion is to probably to bind the legislature doesn't mean that you need to get a unanimous legislative vote that they want to sue. You probably just need a majority, but the Constitution typically doesn't require majoritarianism. It's probably implied in some instances, but if the Pennsylvania legislature just were to say, you know what, good enough for us if you have, for purposes of policing our rights, 27 individual legislatures, doesn't take a majority, we've got a new rule, the rule of 27, and then they can sue on our behalf. Maybe then with that rule, you would say, strangely, it's not a majority, it's not what we typically think of, but the majority was just something that was kind of implied, and so therefore, the rule of 27 made up would give you standing now to invoke the legislator's entire power. So there would be standing in that instance, right? That wouldn't, as I was saying at the beginning, that wouldn't go to standing. That's the distinction in the Virginia case about who can represent the interest. I agree that a legislative body can authorize certain individuals to represent its interest, but that's a separate inquiry. So what you're saying, so what you're saying is those 27 in that instance still couldn't sue individually. What we'd expect in that instance would be the legislator who is now authorized by those 27 individuals to be the lead plaintiff. Is that what you're saying? I said the case reigns. Y'all, the other courts, this court's other decisions, clearly say that what Coleman stands for is at most a new specific act and a majority of the body. So that is what the case law unequivocally says. What the meaning of the majority is and whether that's an Article 3 interest or more of the prudential concerns you're identifying as far as who can represent the interest is less clear, but either way, we're not in a situation here by any stretch in which there is a specific legislative act that's been, for which the outcome has been changed. So those secondary questions about who can represent the interest in this case, and I understand you're asking hypotheticals, in this case don't apply because we're outside the world in which a specific legislative act has been in any way acted upon by something external to the legislative process. Thank you very much. Thank you, Your Honors. So you reserve five minutes. Yes, I want to thank the court for focusing on the federal election integrity involved here and particularly the prioritization that the framers put on the elections clause, which is the fourth section of Article 1, and it's important because that's a rule of fair competition. Who would care about the rules regarding federal elections unless they had integrity in those elections and defining who made the rules? And so in this instance, we see the Arizona redistricting case, the U.S. Supreme Court saying state legislatures have standing to sue, and we see Morby Harper indicating that there are limits on legislative powers under the elections clause. This case is about standing and limitations on the executive branch, and I'm concerned that the executive branch doesn't want federal judicial scrutiny over who's making the rules affecting our elections. Now there's a coming and going. There's a coming in that Coleman said you need a sufficient number to enact a law. These laws were enacted, and then the coming is the point that these changes to election law were made by Executive Fiat without going through the election process. Coleman also described the injury as personal, and how could a personal injury be contingent on someone else suing? It's not part of our legal precedence. So, you know, going back to just the text of the Constitution, you know, I mean, the really interesting thing about both the elections and the electors clause is they mentioned the state legislature, and so I totally get it. I mean, a lot of your arguments would make a ton of sense to me if you showed up and said my client is the Pennsylvania General Assembly, it's the Pennsylvania legislature. So, oh yeah, you fit Arizona, you fit nice. What the Constitution doesn't say is individual state legislators, and so there's a gap that your friends on the other side are saying you don't bridge in this case. You don't bridge the gap between the legislature probably overcoming this injury in fact obstacle, and maybe the entire standing obstacle, and an individual legislator also being able to kind of stand in the shoes and get the benefit of the status of the legislator as a whole. And so what do you do to overcome the gap? The Constitution doesn't say individual state legislatures. It says state legislatures. Right, and it said that in the Article V Constitutional Amendment Ratification Procedure, and the U.S. Supreme Court in Coleman said that it was a personal injury to the individual state legislators. Arizona redistricting case cites and quotes Coleman to find that the state legislature has injuries based on individual state legislator's rights. The Freedom of the Press refers to journalists. It's a body, the legislature is a body of individual state legislators. Individual state legislators have election certificates. They have a right under the Pennsylvania General Assembly parliamentary rules to vote on bills. The Pennsylvania Constitution identifies the state legislature as enacting laws, and of course the Election Clause indicates that the state legislature makes the laws. So it's from that election certificate that they have this. Now going back to the practical reasoning suggested in the Susan B. Anthony List case, that we're really looking for should, is this case appropriate to litigate in the federal court? And it seems that when the political alignment can happen where a state, a body of a state legislature is aligned with the executive, controlled by one political party, and the case isn't broad, that the court should recognize standing for the individual state legislator, so the executive action can be scrutinized to see if it exceeds the limitations placed on the case to Morby Harper. Morby Harper said, hey state legislatures, you're limited under the Elections Clause. Here we'd be saying, hey executives, you're limited by the Elections Clause. And so when we proceed, we say, okay, in those states like Pennsylvania, which is a very important swing state in presidential elections, that if the state legislature, one of the two bodies, is aligned with the governor or executive official who's violating the Election Clause, absolutely, for the purpose of federal election integrity, the federal court should have review of the executive action. And that's what's, I believe, mandated by the Coleman and Arizona redistricting case. I think Coleman would be a lot stronger if, for some reason, the federal defendants or the state defendants somehow prevented your clients from voting on SB 982 or something like that and sitting there saying, hey, you know what, you can't even participate as the legislature. That was closer to the Coleman individual standing as opposed to saying, hey, the vote's gone on perfectly, no one's been denied a vote, and now we just want to make sure that it's enforced and effectuated. And so no one in your clients was denied the ability to participate in the legislative process. And that struck me as kind of a little more important in Coleman, wasn't it? Well, remember, I've described the executive change in the law by Executive Fiat. So the executives didn't go through the legislative process. Coleman said they have set up and claimed a right and privilege under the Constitution of the United States to have their votes given effect, and the state court has denied their right and privilege. The they is the individual legislators. And so when you set up a claim of right and privilege under the Constitution of the United States and then the executive encroaches on it, then the federal court, for the purpose of federal election integrity, to prioritize federal election integrity in the Elections Clause, should hear the case. The Sixth Circuit in the recent case indicated that the Michigan state legislators there would be unsuccessful in boring a good-for-election-clause-only hole in Coleman and Raines. Well, that's too late. The Arizona redistricting case did that, and now it's a natural companion that the state legislature can sue. Then when the state legislature doesn't sue, then the individual state legislators must be able to sue for the purpose of federal election integrity. Do you think the Sixth Circuit was wrong in that case? There are two different cases. Here the facts are different, focusing on the executive limitations. I believe that with respect to that, those portions of the opinion I've indicated, they were in error. Lindsay case, you think Lindsay was wrong? Judge Schott was wrong in Lindsay? Yes, for the reasons I've indicated. So when you, you've discussed Coleman several times, and you've said that the Supreme Court said things about the individual legislators. And, you know, I haven't gone through Coleman word by word to look for this, but I'm not sure that they ever said the individual legislators, because what they were talking about there was the block of 20 legislators, which was the number of legislators that was needed to, that, you know, that voted against the act at issue in that case, right? So is there anything in Coleman that says that those people as individuals, you know, one of them or two of them, any number less than 20 of them would have had standing? Yeah, I read the sentence before. We think that these senators have a plain, direct, and adequate interest in maintaining the effectiveness of their votes. So it sounds personal to me. Thank you. All right. We thank counsel for your argument in this case, and we will.